Page County Treasurer, Ex Officio of the Page County Collector, Defendant, Athlete. I go on behalf of the Plaintiff's Accounts, Mr. Kevin V. Barnes II. I go on behalf of the Defendant's Athletes, Mr. Harris G. Valdez. Thank you. Mr. Carnes. Good morning. We're here before you to ask you to set aside and provide directions to deny a motion for summary judgment granted on behalf of various taxing districts with respect to an objection that the taxing districts engaged in and issued illegal and improper levies of bonds over a period of years to improve the sites of, equip additions to, alter, repair, and equip existing school buildings all under an improper and illegal fraudulent notice that said that they were intending to issue bonds solely for the purposes of increasing or maintaining or establishing a working cash fund. Each district had a working cash fund in place at the time. The intent of the districts at the time that issued the bonds, specifically this was a test case, so there were three districts that were combined in this one. Each of them had had internal discussions prior to the notice published to issue working cash fund bonds that indicated that they felt they could not raise money as the statute required under Section 19 for money to improve the sites of, equip additions to, alter, repair, and equip existing schools because they would not achieve a referendum approval. As a result, all of them met individually within their districts and decided that they would issue a notice for working cash fund bonds. The flaw here, the lie to the public, the fraud was that the disclosure that it was to be used to equip the schools and the rest of the statement I've already repeated, was not disclosed until after the close of business on the 30th day when a referendum would have been requested as a backdoor referendum. The very first notice to the taxpayers that this was not needed for working cash funds occurred two to three hours after the close of the clerk's office, after the expiration of 30 days where a backdoor referendum could have been requested. Counsel, you argue in your brief that Article 20 specifically enumerated the uses for working cash fund money. What are those specifically enumerated uses and don't they include repairing, improving, equipping existing school buildings because that would be part of a corporate purpose? No, Justice Enum, they don't. Section 20 specifically requires that the money be set aside for working cash fund reserves to keep on hand money to pay salaries and current purposes. At the time of most of these, the language was for school purposes. At the time after 2010, it was amended to say corporate purposes. But that's really not the issue, Judge. The issue is that the taxpayers had a right given to them by the legislature to receive proper notice of what the use of these funds would be so they could determine whether or not they wanted to seek a referendum if it was to be truly a working cash fund or whether they had the absolute right to referendum if it was school funds. Well, didn't the notice, excuse me, the specific notice did comply with the requirements of the statute, did it not? There wasn't any requirement that each of the uses be enumerated in the notice. The Supreme Court has held that the requirement is that you must enumerate the purposes and you must identify the individual purposes. As early as 1868, the courts identified that and it has remained the same to the present. This argument turns 150 years plus of Illinois jurisprudence on its ear saying that they could go beyond whatever the purposes were, whatever the grant of authority to levy was, and they could use it for different things without telling the citizens what they're levying for, how they're going to use the funds, or giving them proper notice. So you're saying school purposes or corporate purposes don't include the improving, the altering the school buildings, is that right? Making repairs? No, it could be interpreted that way. But I'm saying that because the legislature provided specific language about how a school district may raise funds, may issue bonds, may levy, and pay for those bonds in Section 19, and because they didn't include that specific language in Section 20, the only reasonable interpretation of that is that the school districts were limited to what was required under Section 19 and not under Section 20. Indeed, the school district's own testimony at trial in the depositions suggested that that's the way they understood it, but they felt they couldn't get a referendum through, and so they thought they would just levy for work and cash fund bonds. So you're saying that aren't there other sections that allowed the districts to issue bonds, like 17.2.11, for the purpose of altering and repairing also? I mean, wasn't there really more than one section that allowed this to happen instead of you're saying it had to only be done under 19? I'm saying it should not have been done under 20 because it was misleading fraudulent notice to the public and did not notify the public in accordance with established Supreme Court requirements and interpretations of the legislature for the prior 150 years. They might very well have been able, depending on the project, to have levied, to file a notice, levy, issue the bonds under 17 or something else. There are three or four different portions of the statute that permit them to issue bonds, some for life safety, some for buildings, some for site and construction. This was none of those. And so what they've done is they've tried to say, well, because it is work and cash and because we have the right to maintain this reserve, we're going to levy it for work and cash. Now, I suggest to you that this argument that's now being made, that we have the right to do this and then we can just transfer it, is pure sophistry. It's a result of this Court's own reversal of the first GIS decision, suggesting that if they had taken money in the work and cash fund and transferred it to the education fund and then from the education fund it could have been transferred otherwise, that was okay. That's not what's at issue here. This isn't about the transfer, right? This isn't about the issue of abatement or abolishment. It's about misleading the public deliberately with advanced intent. So you're saying the intent of 19-3 was any time a school district has to make a repair in a building, they have to go give the notice and get a referendum for repairs that might be, let's say, $100,000. No, I'm saying that that's what the Illinois Supreme Court held in 1875 in School Directors v. Fogelman, citing the 1868 decision in Glynn v. Hopkins, and it's what they have consistently held to date in School Directors v. Fogelman. They specifically stated that the statute at the time declared it was not lawful for a board of directors to purchase or locate a schoolhouse site or to purchase, build, or remove a house without a vote of the people and an election. And they went on to say that the purpose of this, that should they do that, their actions were necessarily unlawful and the acts were null and void. They endorsed the previous decisions in Glynn that said that the bodies could exercise no powers other than expressly granted or as may be necessary to carry into effect the granted power, and it is fortunate for the people that this power is so restricted because if in the face of this law a board of directors could lawfully contract for building a schoolhouse at $600, the contract price of the one in question, what prevents them to contract for a structure that costs $60,000? Now this same theory continues all the way to the present in the Supreme Court's decisions that if there is an enunciation of a right and it relates to the authority to tax, it must be strictly construed in favor of the taxpayers and against the taxing district. They violated that right. They exercised a right that wasn't granted them. And the trial court erred because the only argument that the trial court bases their right to do this on, in his memorandum opinion, was argument, pure argument, in brief or in oral discussions and before the court on the motion, in which it was suggested that it was clearly intended by the legislature that smaller projects, $3 million, $5 million, $10 million, might very well be funded by working cash and the intent of the legislature should be gleaned from the fact that there was a lower ceiling on what could be borrowed for working cash. There is not a single basis for that in either legislative history, in the statute itself, or in any prior decisions. That was seized upon as a moment of argument for the trial court to be able to base its decision and it erred because it ignored 150 years of Illinois Supreme Court precedent and turned it upside down. Then the court goes on and discusses something totally irrelevant, not related to this, the question that this court decided in GIS 1 and 2, which was the question of whether or not the transfer could be appropriate. We're not here to argue about the transfer. I was just going to say, that's a whole different issue. Justice McClaren wrote the opinion. It's decided. We're here to say that they never should have issued these bonds with false and misleading notices and the failure to properly notify the public of what they were about. And more importantly, they continued to do it from the time my predecessor, Mr. James Rooney, initially filed these matters in the early 2000s all the way through to recent times, at least as late as 2010 and 2011. But, I mean, doesn't the newer section 2010 that was added in 2010 allow school districts to transfer money in the working cash fund at any time to any funds in the district that are most in need of it? And, of course, that was retroactive. Why doesn't that cover it? Why isn't that the answer here? With all due respect, Justice Engelhoff, it's not the answer because this isn't about a right to do something once the initial action was illegal and invalid. The Supreme Court has consistently held that the time to determine whether or not the levy was legal is at the time that the levy occurs. It's not about the question of whether or not if they levy illegally, they then have a legal right to transfer. And that's what's at issue here. So you're saying the levy was illegal because the notice was improper. Is that right? That improper was fraudulent. They fully intended before they issued the notice that these funds were going to be used for the repair, improvement of the sites, equipment additions to, alter it, repair and equip existing school buildings. The only deposition testimony in this case from these three districts says that that was clearly their intent ahead of time. Yet they published the notice, and this goes to your point earlier, did they follow the protocol? The only protocol that it applies, that the legislature dictates here, is a format that you plug in which section you're going to use and what the purpose is. If the purpose is fraudulent and illegal, if it misrepresents what the true purpose is, it's illegal. That's what they did. And they continue to do it. It's as simple as that. And they constructed an argument retrospectively knowing that this court has now ruled in GIS and hoping that you will give them another get-out-of-jail-free card like they got the last time, saying that, well, everything's okay because they have the right to transfer. That's not what happened here. What happened here is the trial court turned the Supreme Court on its head. It had no right to do that. This court has no right to do that. The Supreme Court has recently rebuked the first district for that. The precedent here is the taxpayers had a right to have the only taxing grant construed most strictly in their favor. And that grant, construed most strictly in their favor, required that they receive actual notice of the correct intent in time to determine, in this instance, if they truly wanted to issue working cash fund bonds, to determine whether or not we, I'm not a taxpayer of that particular district, but to determine whether or not my clients wanted to go out and seek a backdoor referendum or, indeed, maybe wanted to come into court to bar the use of the working cash fund and say this is improper and seek judicial intervention. They were denied both these rights because they weren't told. They hid the true intent until the evening following the expiration of their right to actually file that petition. Only then do they actually come out and use the exact language from Section 19. Now, they say that they have that right, and to my mind, that smacks of Ipsy Dixon. We say we can do it, therefore we can do it. They cite to nothing else, nothing in the legislative history of working cash, prior to the times these happened. Let's keep in mind that this will far predate GIS 1 or GIS 2. Well, what about the plain language of the statute, however? The plain language of the statute, as I've argued in my briefs, is the inclusion of one specific right is the exclusion of others. And in this instance, where at the same time the legislature has expressed its intent that certain authority is granted on the one hand, exactly as we've discussed for Section 19, to improve the sites, other equipment, et cetera, and certain language is expressed in the next exact section, you can raise these for working cash, the two are exclusive. It doesn't assume that the legislature intended it. Well, we can also confabulate this and say, oh, well, since we've got it over there, those are for big projects, we can just use it over here for small projects. There is no such grant of authority. Well, but there's no conflict. I mean, the specific governs if there's a conflict between the two sections, correct? I would dispute that, Justice Stevens. Yes, if there is a direct language conflict, certainly the specific governs. But in this case, because this is the grant of cash in authority, going back to the 1870 or 1848 or whatever it was constitution through the present, the case law has said that the school districts have only that authority granted by the legislature and they must be strictly construed and they have no other authority. And they've never been granted this authority. But let's talk about where it has happened in the legislature. I cite in my reply brief the fact that the legislature, specifically when they wanted to be able to have a district use working cash funds for building, granted the Metropolitan Sanitary District of Cook County that right and they allowed them to create a working cash fund for buildings. Same session of the legislature that they created a working cash fund for the purpose of maintaining the funds. There are 21 separate exceptions in Section 19 that were granted to different school districts which allowed them to raise additional funds. If the school districts needed additional funds, they could have gone back and sought an exception or they could have done what they were supposed to do and seek a referendum. Any other questions? No. Thank you. You'll have an opportunity to make the bubble. Thank you, Justice. Thank you, Justice. Mr. Galeanis. Galeanis, correct. Thank you, Your Honor. May it please the Court, good morning, Counsel. My name is Eris Galeanis. I'll be arguing on behalf of the Eppley-Intervenor School Districts as well as the Eppley-DuPage County Treasurer. I'm joined in court by my colleagues from the county and from some of the other school districts as well. This is the issue before the Court this morning. Does the school code require a direct or front-door referendum for an Illinois school district to issue working cash fund bonds under Article 20? I'm sorry, go ahead. I would say the answer is no, Your Honor, and the trial court was correct in granting summary judgment. The Illinois General Assembly has established a system, and think of them as different categories. No referendum required, back-door referendum required, front-door referendum required. Article 19 building bonds fall into this bucket over here, front-door referendum required. You have the most taxing authority, the largest borrowing authority, 6.9% of a district's EAB. So think about it, a school district with, say, a $500 million tax base, which is not a large tax base in terms of EAB, could borrow up to $34.5 million under Article 19 building bonds, which require the General Assembly has essentially said, we've given you this authority to borrow, go to the taxpayers first. The question itself under Article 19 has to be very specific. We want to build a new high school. We're going to develop a new campus for our pre-K program, whatever the case may be. That's this bucket over here. The middle bucket is where the working cash fund bonds come in. Working cash fund bonds, limited bond, alternate revenue source bonds, where the General Assembly has said, you can issue these bonds and there will be a referendum, but there will only be a referendum if registered voters living within the taxing district come in and within 30 days provide you with an excess of 10% of their signatures needed. And that will put the question on the ballot. And that happens routinely. And then you've got this third category. The triggering event is the notice, correct? That's right. And so for example. And so doesn't that notice have to be pretty specific? If I'm giving up a right to file a petition or to sign a petition, shouldn't I understand what it is that's on the table? And the General Assembly has addressed that as well. So for Article 20 working cash fund bonds, the notice itself is for working cash fund purposes. That's what the General Assembly said. And what's interesting, let's say a group of taxpayers musters the requisite signatures. If the question goes on the ballot, the question is, can we issue bonds for working cash fund purposes? So the notice provided by the Board of Education when they issue this intense resolution says, we'd like to issue it for working cash fund purposes. If the signatures are gathered and the question goes on the ballot, the ballot question doesn't say, we want to do these 100 projects. It says, can we issue them bonds? Nonetheless, but those who would oppose that can't fully articulate and garners support for a no vote. Even though the ballot may say for working cash bonds, I hope I said that correctly. Yes, yes. But those who are opposing it can put out pamphlets or literature, mailers, et cetera, and where they elaborate that here is in effect what that money is going to be used for. Correct. Yeah. So really what's on the ballot is true but not necessarily dispositive. Well, what's on the ballot is what the General Assembly says should be on the ballot. Right. For working cash fund purposes. What's in the Notice of Intense Resolution is what the General Assembly said should be in the Notice of Intense Resolution for working cash fund purposes. Let's use Agasca 10 as an example. Let's take the objector's argument. They issued a little under $2.7 million in working cash fund bonds, deposited the proceeds into their working cash fund. Over a two-year period, and this is spread of record, they did about 100 different projects. So replacing floor tiles, doing HVAC work, doing gutter work, putting new locks on the doors. So it seems to me that the objector's argument would put the school districts in a trick bag. You've got to put a question on the ballot that says we're going to do 100 separate projects, and then the voters would have to approve it. That's not what the General Assembly has called for. You've got your life safety bonds, which are the no referendum ever bonds. You've got working cash fund, you've got limited bonds, and alternate revenue source bonds, which are the backdoor referendum, which happens. And then you've got the building bonds, which are for the major projects, maximum taxing and borrowing authority. So the General Assembly has set up a system, Article 17, Article 20, Article 19, and the types of bonds you can issue under PTEL, which would be limited by the debt service extension base. Those would also be in the backdoor referendum category. All right, but I basically laid that out, not in the detail that you just did, but opposing counsel indicated that their initial problem was that the notice was fraudulent. How do you respond to that specifically? Yeah, I would say it's easy to throw around loaded terms like that. School districts are bound by the school code. It's a comprehensive scheme of regulation. There are 34 separate articles in the school code dealing with everything from how you interact with the township school treasurer, what are the rights of students getting special education, issuance of life safety bonds, capital projects, you name it. So the school districts follow the language of the school code. Did this notice follow the language of the school code? Yes, it did. Was it deficient in any way? No, it was not deficient, Your Honor. It said what the school code requires is we are going to issue these bonds for working cash fund purposes. Let me assure you that had our clients started freelancing with the language, the objectors would be arguing about that. Had they said we're going to do this, we're going to do that, we're going to do this, the objectors would say the statutory notice was not complying with the statute. Our clients followed the statute. And that's not even in dispute here that they followed the statutory requirement. It is not disputed that the expenses were for necessary, reasonable things like the things Itasca School District did. The statutory notice was followed. What the objectors are saying is this Article 19 front door referendum requirement must be grafted onto the authority provided in Article 20 for the issuance of working cash fund bonds. That's not what the General Assembly has said. This is a long-standing, decades-long process that school districts have used to issue working cash fund bonds on a statewide basis. They're not making things up as they go along. They look at the statute, the notice that comports with the statute, and that's what's happened here. There's not a dispute that they did not follow the language of the Article 20 notice. If you issue working cash bonds, that's what you have to follow. You're making a cogent argument. The problem I'm having with it is the fact that notice may be proper doesn't mean that it's proper if it is inaccurate. If the intent, as Mr. Karn says, was different and changed within a day or hours, how do you relate to that? It sounds like you're saying that we played Pinochle correctly, except this was a bridge tournament. And so if it's a bridge tournament, you should be playing by bridge rules instead of by Pinochle rules. Well, I guess I don't see it that way. And under one section, your notice was proper. But apparently under another section that may relate more specifically or more appropriately to the intent that was discerned shortly after the notice was filed, it should have been under that section that we interpret or the trial court interpreted the law. Well, what the statute talks about in Article 20 is what are the purposes for the issuance of the bonds. And in this instance, in every instance for these 16 school districts and the multiple issuances, the purpose was to raise money for working cash fund purposes. Those funds were immediately deposited into the working cash fund in every instance. And then the circumstances are a little bit different. In some cases, the money was transferred shortly thereafter for projects. For Itasca 10, it was transferred in small amounts over a two-year period. For another one of the school districts here, it was transferred over a three-year period. So the statute requires that the purposes be for working cash fund purposes. The name itself allows for a great deal of flexibility. Working cash fund bonds can be issued for school purposes. Then the statute was changed to corporate purposes. If you look at our brief, we look deeply at what does corporate purposes mean. In Illinois, corporate purposes means as long as it has a nexus to or is connected with what the mandate of the entity is, whether it's a municipality, a school district, some other entity, it is a corporate purpose. And that's how these funds were used. How do you respond to counsel's argument about the depositions in which those who were deposed said basically, this is what we're calling it, but this is what we're going to do, and the two are unrelated? Well, the General Assembly contemplates that. I mean, that's why we've got this. The General Assembly thinks it's all right for elected officials to say, well, here's what we're going to tell the public, but here's what we're going to do? I wouldn't say that. I would say what the General Assembly allows for. That's close to what you just said, though. That was not the intention, Your Honor. What the General Assembly allows is for a school board to say, we don't want to have a front-door referendum. Now, when you make that determination. Of course you don't want to have a referendum. You are greatly limiting your borrowing authority. You're going from 6.9% of your EAB under Article 19 building bonds to 85% of the Ed Fund rate, which is significantly smaller. So let's go back to the Itasca 10 example. As I mentioned, had they wanted to issue Article 19 bonds, they could have borrowed in excess of $36 million. They borrowed less than 10% of that by issuing these working cash fund bonds, and that's because it is a much more limited authority to borrow and to issue bonds. Right, but still doesn't the notice have to comport to what it is you presently intend to use the money for? It does. And the deposition, as I understand counsel, is this is what we're going to tell the public, but we all know here and have decided that we're going to do something very different with that money. What the statute requires is that the notice comport with the statute, which it did. So in this instance, the statute says you've got to tell the world, your voters, that the bonds are being issued for working cash fund purposes. That's what the notice has said in every instance. Had these questions been on the ballot, the notice would have been exactly the same. Right, we've been around that line. And they can decide. But it sounds to me like what you've done is you have complied with the letter of the law but failed miserably to comply with the spirit of the law. I don't agree with that, Your Honor, and I'll tell you why. I'll tell you how working cash fund bonds come to be issued. A school board doesn't just show up one night and there's an action item saying, let's issue some working cash fund bonds. There are months of buildup to something like this. There are multiple presentations by the school, chief school business official, the CSBO at the school district, oftentimes the superintendent. Depending on the nature of how the money is going to be spent, you might have some outside expert come in and talk about it. So months of planning before the money is spent. A public meeting where the notice of intent resolution is approved. A publication of that notice in a paper. You come back at another meeting and you adopt a resolution to issue the bonds. That's another public meeting. And then when the money is spent, it can only be spent if it is transferred legally from the working cash fund to either operations and maintenance, educational fund, another suitable fund. That is also a board action. So we're talking about something that is publicized to the board both in agendas at the meetings themselves, in many instances online because you can watch most meetings these days on TV if you want. So we're not talking about hidden actions. We're talking about actions that are projected to the community, thus this backdoor option where you can come in and say, no way, we don't want you to spend the money this way. That's why it happens. There was a backdoor referendum petition filed last week in a nearby community. These sorts of things happen. It's a viable, effective way. If people feel that the school board is not going to be spending the money, they think the way it ought to be spent. And again, on top of that, layering on top of all of that, is you've got the General Assembly limiting the taxing authority, setting forth the statutory remedies. And again, these school districts could have said, let's go to referendum, Article 19, building bond. We're going to do it. We're going to do X, Y, and Z and put that into question. You can't put that into question for working cash fund bonds. You must say to be issued for working cash fund purposes. The buildup to that is the education of the community, the newsletters that go out. These things aren't done in secret. These are public bodies. These are all open session actions here. So if someone is saying, we don't know what's going on, what is the obligation to know what's going on in your community, I would say? You know, everyone, it's easy to be the critic. But if you live in a community and you think something isn't right, there are opportunities to be engaged and do something about it. And that's where the backdoor referendum petition comes in. That's why you can attend meetings. That's why there's a public comments section in every public meeting for every public body. So in this instance, you know, we've got school districts that have completely complied with the law. They have followed the law. And the General Assembly has laid out what the law is. This isn't an issue of the transfers. The court has adjudicated that issue, showing there was absolutely no public harm, putting the funds in the funds that they went into. If you do the expenditure multiplier calculations under Central Illinois Public Service and all the progeny cases, nobody was even close, not a single school district was close to that two to three times limitation. The school districts here have simply done nothing wrong. They've followed the law. And this court respectfully should affirm the granted summary judgment from Judge Fullerton. What about the argument that Section 19-3 is more particular than a statute in Article 20, as counsel argued, and should have been followed because it's more specific? I think if the General Assembly wanted that to be the case, Your Honor, they could have said in Article 20, you've got to follow the Article 19 provisions. There are all sorts of references within one aspect of a statute to another. They didn't do that. They laid out a comprehensive method and system for the issuance of working cash bonds in Article 20, and our school district clients followed those all the way down the line. There's no question about that. What about the effect of the addition of Section 20-10 in 2010? How did that affect the school districts, and how does that impact any issues in this case? Yeah, I think it's evidence that that dealt specifically with the ability to transfer to the fund most in need subject to some limitations. I think what it shows, Your Honor, is sort of the General Assembly's desire to provide greater flexibility to school districts. It is retroactive in its application. It dealt with some of these prior transfers, validated everything. But what you've got there is just more evidence that Article 20 speaks to these kinds of bonds. That's where the authority is. And the General Assembly was amplifying that and demonstrating that this is where you look when you want to issue working cash fund bonds. Thank you so much. Thank you. Mr. Carnes. I think the problem here is we are really talking about playing bridge and peanut, as Your Honor just observed. The issue here is, as the Supreme Court has held, perhaps as early as 1926, in Dupal, Calif., versus the Chicago, Milwaukee, St. Paul, and Pacific Railroad, that if the action of tax levying is not authorized by law, it's illegal and the legislature can't validate it by a curative act. Section 20-10 has nothing to do with what we're here about. What we're here about, and nobody has raised this from the districts because they don't want to, the night that they adopted their resolution, the night that the 30 days expired for the people to have understood that it was not the intent to raise working cash fund bonds and use them for working cash fund purposes, but truly to raise them and use them for purposes to acquire, alter, equip schools, et cetera, as I've said several times, that night the resolution is changed from the notice 30-some odd days earlier to the language to issue working cash fund bonds for the purposes of, and it goes on and it specifically says, altering, equipping, maintaining, updating, et cetera, the language of Section 19. How are those not school purposes? How are those not school purposes? I'm not here to argue that they may not be school purposes, Justice Senoff. I'm here to argue that they misled the public because they noticed for working cash that there's no intent to truly keep that money in working cash for working cash. The intent was to sell the districts where they got it and immediately transfer it. Counsel, what are the purposes of the working cash fund? Reserves. Pardon? Reserves. Oh, they're only to be kept for reserves. They cannot be spent. Of course they can't. Well, so for what purposes may they be spent under the school code? The General Assembly did not see fit to identify individual specific purposes. Originally the two most recent incarnations of that portion of the statute are either school purposes or corporate purposes. And what do those mean? This goes back to the discussion you challenged me about earlier, which I appreciate the opportunity to discuss, and that was what does 19 say? It says here are the funds that you use for all these purposes. What does 20 say? Here are the funds that you can use for these purposes. There's not anybody that has argued on the district's side that they didn't already have a working cash fund, that it wasn't adequate for its purposes. Could you say working cash fund is only to be kept for reserves? That's what I heard you just say a couple minutes ago. When working cash funds were created over 100 years ago, the original purpose was to have it there for reserves to avoid the need to issue tax warrants or tax anticipation warrants, as they used to be called, and to be able to pay teacher salaries or make draws for teacher salaries immediately. Now, over the years, those interpretations have morphed, but this issue is exactly what the Supreme Court and this Court addressed originally in Harding v. Northwestern Railway in 1952. It's not possible. It's not possible for them to need working cash fund bonds, and yet immediately, in the case of some of these districts, transfer them out when they get there. Either they need the working cash fund bond or they don't. This Court adopted that ridiculous sophistry in GIS 1 and said, it's not possible. You can't say you need working cash fund bonds and immediately upon receipt give them to another fund. Yet that's what was done most prominently in many of these, although I agree with Mr. Daly on this, School District 10, ICASF 10, did not, in fact, do it that way. But that's not the point. The point was the intent was known in advance. In response to Justice Jorgensen's questions, counsel addressed the issue of we go through this great set of facts. We tell the Board this. We have presentations. We talk about this. They didn't talk about that to the public. They knew going into the notice that they were going to use them for working cash fund bonds immediately to be used to equip the buildings and maintain them, but they didn't tell the public that. So that is the fraud that's here. That's the failure of the notice. That's a deliberate act to ignore what the legislature required that they do. And this Court has addressed this as recently as 2010 in the Raczykowski v. Sycamore case, in which case Justice Jorgensen, I believe, wrote the opinion, the Constitution says that the schools shall only have those powers granted by law and these statutes are to be strictly construed, any doubt resolved, against the district. The Fraud Court did not resolve any doubts against the district, number one. Number two, it wasn't strictly construed. Number three, it's pure sophistry to argue that because they followed a rote protocol, because they followed a rote protocol that could have been appropriate had the need existed for working cash funds, that therefore it was appropriate to do it and not say that it's not for working cash funds. And the evidence, the facts that establish that the tax payments were defrauded is the fact that in many of these districts, the funds, as Mr. Dallias just conceded, were transferred immediately upon receipt. Assuming that you're granted the relief, does that then mean that this case has to go back and there has to be a hearing on each and every school district as to whether or not the way in which they administered their particular individual fund was meritorious in this? Because this appears to be something in the nature of a quasi-class action suit. Well, Justice McClernand, I suspect that probably among all the appellate courts in the State, you're most familiar with these issues and the issue of class action versus not class action. But in this case, the parties, the districts, agreed that they wanted to file a test case. And their argument was not whether or not there were individual differences, but rather whether or not a notice published under WCF Section 20 to raise funds from WCF could be used to raise funds to alter, equip, modify, etc., the schools. So to your question, no. You better than anybody here knows that this Court can make a decision and finalize it and say the trial court was wrong. The summary judgment only should not have been granted. But what I mean is that it should be sustained. At the trial court level, was there only one judgment rendered? Yes. On one tax objection, and therefore the other ones are still pending down below, waiting for us to review this? And then based upon what we say, there will be summary orders entered or litigation ensues in the individual other tax objections? I think there's really five questions there, but let me just try. Two more. I think, I had maybe six. I think the issue was this. Both taxpayers, by my office and previously by Mr. Roney's office briefly, and all of the various districts agreed with Judge Fullerton that they could challenge this. They originally filed with District 10. We said, look, we'd like to include a couple of other districts because each district had a little bit of difference and so we tried to put a representative sample of a couple together that would show you those differences. What the court did was say, what we're going to do is we're going to address this with the agreement of the parties. We're going to address this as a group. And you all understand that whatever my decision is, we'll apply to the group as a whole. You can take it up to the second district. Actually, that was pressure. He said, I'm sure you will. Take it up to the second district regardless of what I wrote and then we'll see what happens. Now, if you side with the districts and say pure road following of this is okay and the General Assembly gave you that authority, then that defeats all the objections across all years across all districts. If you side with me, the opposite is true and all those objections are valid objections and the districts have conceded the element of my objection, which is that they only published under Section 20. They only disclosed WCF and 10. They only notified the public after the expiration of the 30 days that it was an intent to issue WCF bonds but to use them for Section 19 purposes. So to me, that says that should this panel so decide, you can decide the fact there as well and not have to send it back to Judge Fortin. What Judge Fortin might need to do would be either hold some free trials or evaluate the nature or extent of what illegality there was because I don't represent all the taxpayers of all the districts, obviously. I represent a small portion. So it's really only my taxpayers, not everybody in every district, that would be affected here. You basically are telling me what I thought I knew. I was certain of it. I ask a question to certify my knowledge. I'm not sure I helped you, but thank you for asking. Well, there will be genicum waitlies and camp followers regardless. There always is in tax objection cases. Yes, Your Honor. We will recess for lunch and reconvene at or about 1 o'clock in the afternoon. Court adjourned.